STATE OF NORTH CAROLINA v. MARCUS DOUGLAS JONES, SR.

No. 22A02

(Filed 7 May 2004)

## 1. Jury— voir dire—conceptions of parole

There was no error in the denial of a capital first-degree murder defendant's motion to permit voir dire of prospective jurors about conceptions of parole eligibility for a person serving a life sentence.

## 2. Jury— selection—capital trial—passage of entire panel to defendant

The trial court did not err in a capital first-degree murder prosecution by following the method of jury selection in N.C.G.S.

§ 15A-1214(d), under which the State is allowed to remove some prospective jurors and replace them with others before passing the entire panel to the defendant.

**3. Jury— selection—15 member panels—randomness**

Defendant waived review of the randomness of a jury chosen from 15 member panels by not challenging them properly.

**4. Jury— selection—rehabilitation—ability of system to answer concerns—legal conclusion**

There was no abuse of discretion during jury selection for a capital first-degree murder in sustaining the State's objection to defendant's question about whether the system took into account his concerns about the strength of the evidence. The question called for a legal conclusion.·

**5. Jury— selection—capital trial—excusal for cause**

The trial court did not abuse its discretion by excusing two jurors for cause during jury selection for a capital first-degree murder prosecution where one juror wavered about whether he could vote for the death penalty and eventually said that he was predisposed for life imprisonment, and the other remained unequivocal in his unwillingness to give proper weight to aggravators and in his preference for a life sentence.

**6. Evidence— statements by defendant—duplicative—relevant and admissible**

Statements by a first-degree murder defendant to medical personnel that he shot his wife and stepson and that he was drinking at the time were relevant and admissible, even if they duplicated other evidence.

**7. Appeal and Error— preservation of issues—statements to nurses—not raised at trial or in assignments of error**

A first-degree murder defendant's contention that his statements to nurses were inadmissible hearsay was not reviewed where defendant did not include that argument in his trial court motions or his assignments of error on appeal.

**8. Evidence— audiotape—properly authenticated**

An audiotape of a first-degree murder defendant arguing with his victims was properly authenticated where the tape was found in a victim's desk ten months after the murder and passed

STATE v. JONES

[358 N.C. 330 (2004)]

through several hands before coming into the custody of the district attorney's office. Testimony at a voir dire hearing was sufficient to establish the accuracy of the tape, demonstrate that it was legally obtained, and support a finding that the tape contained competent evidence of defendant's malice, intent, and ill will toward the victim.

**9. Evidence— hearsay—tape of defendant arguing with victims—offered to show malice**

An audiotape of a first-degree murder defendant arguing with his victims was not inadmissible hearsay because it was offered to show malice rather than the truth of the statements.

**10. Evidence— audiotape—defendant arguing with victims—probative value not exceeded by prejudice**

The probative value of an audiotape of a murder defendant arguing with his victims was not exceeded by its prejudice. When a husband is charged with murdering his wife, as here, evidence spanning the entire marriage has been allowed consistently to show malice, intent, and ill will.

**11. Evidence— officer's opinion—admissible**

There was no error in a first-degree murder prosecution in the admission of a police officer's opinion about which victim was shot first. The court implicitly recognized the officer to be an expert in crime scene investigation, and his experience, the nature of his job, and his personal investigation of the crime scene qualified him to offer expert testimony to demonstrate how the crime scene was found.

**12. Evidence— defendant's mental status—basis of expert's opinion**

There was no error in a capital first-degree murder prosecution in allowing an expert in forensic psychiatry to testify about an on-call physician's observations of defendant's mental state on the night of the murders, or about his own observations of defendant's mental state when he was admitted to Dorothea Dix Hospital. An expert may testify about the information he relied upon in forming his opinion so long as that information is of a type reasonably relied upon by experts in the field.

STATE v. JONES

[358 N.C. 330 (2004)]

## 13. Evidence— psychiatrist's opinion—defendant's mental state at time of murder—interview one year later

An expert in forensic psychiatry was properly allowed to render an opinion about a first-degree murder defendant's mental state at the time of the murders based upon his interviews, personal observations, and review of reports, although he did not meet defendant until more than a year after the murder.

## 14. Criminal Law— prosecutor's argument—first-degree murder—alcoholism and low I.Q.

A prosecutor's argument that the jury should not accept any attempt by defense counsel to blame defendant's murders on alcoholism or low IQ instead of his own choices was not improper.

## 15. Criminal Law— prosecutor's argument—defense psychologist

A prosecutor's argument that defendant's psychologist only noted those things useful to his client was not condoned, but there was no objection at trial and the argument was not so grossly improper that the trial court erred by not intervening ex mero moto.

## 16. Sentencing— capital—aggravating circumstance—course of conduct for two murders—separate evidence for each murder

There was no error in submitting the course of conduct aggravating circumstance in a capital sentencing proceeding for each of two murders where defendant contended that the jury must have relied on the same evidence in both crimes because both victims were killed at approximately the same time. There was separate evidence for each murder, and the jury may find this aggravating circumstance where defendant killed more than one victim. N.C.G.S. § 15A-2000(e)(11).

## 17. Sentencing— aggravating circumstance—especially heinous, atrocious, or cruel—family killing

The trial court did not err by submitting the especially heinous, atrocious, or cruel circumstance in a capital sentencing proceeding for the murder of defendant's stepson where defendant killed his wife and then his stepson. This circumstance is proper when a parental relationship exists between the victim and the accused; moreover, defendant's stepson was in close proximity to the horrific murder of his mother, being

sprayed with her blood after a shotgun blast, and he was aware of but helpless to prevent his own impending death. N.C.G.S. § 15A-2000(e)(9).

## 18. Sentencing— aggravating circumstances—especially heinous, atrocious, or cruel—course of conduct—not overlapping

The especially heinous, atrocious, or cruel aggravating circumstance did not completely overlap the course of conduct aggravating circumstance. Ample evidence existed to support each circumstance.

## 19. Sentencing— aggravating circumstance—course of conduct—not unconstitutionally vague

The course of conduct aggravating circumstance is not unconstitutionally vague.

## 20. Criminal Law— prosecutor's closing argument—prosecutor allowed to cure error

The trial court did not err in a capital sentencing proceeding where the prosecutor, during his closing argument, attempted to play an audiotape of the defendant arguing with the victims, defendant objected, and the court allowed the prosecutor to cure any error by telling the jury that the tape had been admitted only to show malice. Allowing the prosecutor to cure the error did not show favoritism because the decision was made at a bench conference.

## 21. Sentencing— prosecutor's argument—sequence of murders—supported by evidence

The prosecutor's capital sentencing argument that defendant shot his wife before shooting his stepson was supported by the evidence.

## 22. Sentencing— prosecutor's argument—gunshot sound effects

There was no gross error requiring intervention by the trial court ex mero moto in a capital sentencing proceeding where the prosecutor used sound effects while holding the shotgun used to kill the victims. However, the prosecutor's use of sound effects is not condoned.

**23. Sentencing— prosecutor's argument—jury to imagine victims' thoughts**

The prosecutor's argument in a capital sentencing proceeding that the jurors should imagine what the victims were thinking was not so grossly improper that the trial court erred by failing to intervene ex mero moto.

**24. Criminal Law— prosecutor's argument—defense expert—impeachment**

The prosecutor argued from the evidence in a capital sentencing proceeding when he impeached an expert defense witness by emphasizing that the witness had said that certain test data should not be turned over to unqualified people, and then pointed to a test answer that seemed well within the grasp of jury members but was unfavorable to defendant's theory of the case.

**25. Sentencing— instructions—life without parole**

There was no error in a capital sentencing hearing where the court included "without parole" when it first described life imprisonment, but merely said "life in prison" thereafter.

**26. Sentencing— death penalty—proportionate**

A death sentence was proportionate for a defendant who murdered his wife and stepson with a shotgun in their home.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of death entered by Judge W. Allen Cobb, Jr., on 9 November 2000 in Superior Court, Onslow County, upon jury verdicts finding defendant guilty of two counts of first-degree murder. Heard in the Supreme Court 7 April 2003.

*Roy Cooper, Attorney General, by Teresa H. Pell, Special Deputy Attorney General, for the State.*

*Margaret Creasy Ciardella for defendant-appellant.*

ORR, Justice.

Defendant, Marcus Douglas Jones, Sr., was indicted on 14 September 1999 for the first-degree murders of his wife Benita[1] Irene Futrell Jones and stepson Marvin Chase Thomas. Defendant was

---

1. We note that the indictment refers to the female victim as "Benita," while the transcript and the parties' briefs refer to her as "Bonita." In order to remain consistent, we refer to her as "Benita."

tried capitally, and the jury found him guilty of both murders on the basis of premeditation and deliberation. Following a capital sentencing proceeding, the jury recommended a sentence of death for each of the murders, and the trial court entered judgments accordingly.

The State's evidence at trial tended to show the following:

On the night of 24 July 1999, while in his marital home, defendant used a twelve gauge shotgun to shoot and kill his wife, Benita Jones, and stepson, Marvin Thomas. Defendant then used the shotgun to shoot himself in the face.

Onslow County Deputy Sheriffs Robert Marshall and Ralph Hines went to defendant's home in response to a 911 call. Defendant answered the door. Deputy Marshall testified that "[w]hen Mr. Jones opened the door, I noticed a large portion of his face appeared to be missing. There was a large area [sic] appeared to be blood and soft tissue hanging down from the chin area."

Deputy Marshall further testified that he saw two bodies (later identified as the bodies of Benita Jones and Marvin Thomas) lying on the couch in defendant's home. Deputy Hines testified that he rode with defendant to Onslow Memorial Hospital, where defendant was treated for his gunshot wound. Defendant was later transferred to Pitt County Memorial Hospital where he remained until 24 August 1999, when he was arrested and taken into custody.

## JURY SELECTION

[1] First, defendant argues the trial court erred by denying his pretrial "Motion to Permit Voir Dire Examination of Potential Jurors Regarding Conceptions of Parole Eligibility on a Life Sentence." Defendant claims his state and federal constitutional rights to be tried before a fair and impartial jury were violated because he was unable to determine jurors' perceptions regarding life in prison without possibility of parole. Defendant argues he was unable to make reasonably intelligent use of his peremptory challenges because of the trial court's denial of his motion. However, "[w]e have held that a trial court does not err by refusing to allow *voir dire* concerning prospective jurors' conceptions of the parole eligibility of a defendant serving a life sentence." *State v. Smith*, 347 N.C. 453, 460, 496 S.E.2d 357, 361, *cert. denied*, 525 U.S. 845, 142 L. Ed. 2d 91 (1998); *State v. Neal*, 346 N.C. 608, 617, 487 S.E.2d 734, 739-40 (1997), *cert. denied*, 522 U.S. 1125, 140 L. Ed. 2d 131 (1998). We find no reason to

depart from our prior rulings on this issue. Therefore, defendant's assignment of error is overruled.

**[2]** Next, defendant contends the trial court erred by following the method of jury selection set out by N.C.G.S. § 15A-1214(d). Defendant claims N.C.G.S. § 15A-1214(d) improperly permits the State to remove prospective jurors from a twelve juror panel and replace them with other potential jurors before passing the entire panel to defendant, and thus violates defendant's constitutional rights.

Defendant contends that N.C.G.S. § 15A-1214(d) is unconstitutional and deprives him of his right to a fair and unbiased jury because, according to defendant, the statute allows the State the advantage of passing the jury panel of its choosing. However, in *State v. Anderson*, we upheld the statutorily mandated procedure, stating: "We believe that in enacting N.C.G.S. § 15A-1214, the legislature intended to provide uniformity in the selection of jurors in criminal cases." *State v. Anderson*, 355 N.C. 136, 147, 558 S.E.2d 87, 95 (2002). In the case at bar, the trial court did not err because it followed the mandate in N.C.G.S. § 15A-1214(d). Hence, defendant's assignment of error is without merit.

**[3]** In his next assignment of error, defendant contends the process of subdividing potential jurors into fifteen member panels violates the randomness requirement of N.C.G.S. § 15A-1214(a) and violates his constitutional right to a fair and impartial jury. N.C.G.S. § 15A-1214(a) states in part:

> The clerk, under the supervision of the presiding judge, must call jurors from the panel by a system of random selection which precludes advance knowledge of the identity of the next juror to be called.

N.C.G.S. § 15A-1214(a) (2003).

In order to properly allege a violation of N.C.G.S. § 15A-1214, a defendant's challenge to a jury panel "[m]ust be in writing," "[m]ust specify the facts constituting the ground of challenge," and "[m]ust be made and decided before any juror is examined." N.C.G.S. § 15A-1211(c) (2003). Such challenges to jury selection must be made at the trial court level. N.C.G.S. § 15A-1211(b) (2003). Because defendant did not properly challenge the jury selection procedure before the trial court, he waived his assignment of error. *State v. Cummings*, 353 N.C. 281, 292, 543 S.E.2d 849, 856, *cert. denied*, 534 U.S. 965, 151 L. Ed. 2d 286 (2001) (holding that by failing to object to

the trial court, defendant waived his argument that juror panels violated the randomness requirement of N.C.G.S. § 15A-1214(a)). Additionally, because defendant failed to object to the jury panels, he has waived review of his argument that the panels were unconstitutional. *Id.* Accordingly, we overrule this assignment of error.

[4] Defendant next contends the trial court improperly sustained the State's objection to a question defense counsel posed during his attempted rehabilitation of prospective juror Robert Coxe after the State challenged him for cause. "[W]hile counsel is allowed wide latitude in examining jurors on *voir dire*, the form of counsel's questions is within the sound discretion of the trial court." *State v. Jones*, 339 N.C. 114, 134, 451 S.E.2d 826, 835 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995). Hence, we must determine whether the trial court abused its discretion by sustaining the State's objection.

Prospective juror Coxe raised his hand when the trial court asked whether any of the prospective jurors had "personal feelings about capital punishment." Through questioning, the prosecutor elicited from Coxe that Coxe had strong reservations about the death penalty and was reluctant to give weight to aggravating factors. The prosecutor challenged Coxe for cause. The trial court then permitted defense counsel to attempt to rehabilitate Coxe as follows:

[Defense]: Specifically, one of the questions, of course, you understand that the aggravating factors, there's a greater burden of proof on those than other mitigating factors. Do you understand that?

[Coxe]: Sure.

[Defense]: Proof beyond a reasonable doubt and that the defendant, if we do get to mitigating facts, the facts which reduce the reason for the imposition of the death penalty in a certain case, they only have to be proved by a preponderance or fifty percent of the evidence and you understand that.

[Coxe]: Sure.

[Defense]: So the system already seems to take into account your concerns about the strength of the evidence with respect to the cases, is that correct, Mr. Coxe?

[State]: Objection.

[Court]:  Sustained.

[Defense]:  Understanding that, do you believe you could now be a fair and impartial juror in this case and follow the Court's instructions as to the law, Mr. Coxe?

[Coxe]:  Going back over what I've already said, if my duty as a juror is to give both sentences equal consideration, I don't think I could.

The prosecutor then renewed its challenge to prospective juror Coxe for cause, and the trial court excused him. Defendant contends that the trial court erred by sustaining the State's objection. We disagree.

"The regulation of the manner and the extent of the inquiry rests largely in the trial judge's discretion." *State v. Bryant*, 282 N.C. 92, 96, 191 S.E.2d 745, 748 (1972), *cert. denied, White v. North Carolina*, 410 U.S. 958, 35 L. Ed. 2d 691, and *cert. denied, Holloman v. North Carolina*, 410 U.S. 987, 36 L. Ed. 2d 184 (1973). This Court may reverse for abuse of discretion only upon a showing that the trial court's ruling in regards to the examination of prospective jurors "was so arbitrary that it could not have been the result of a reasoned decision." *State v. Allen*, 322 N.C. 176, 189, 367 S.E.2d 626, 633 (1988).

Defense counsel's question was improper because it called for a legal conclusion: whether the system already addresses the prospective juror's concerns about the strength of the evidence. We have consistently held that "counsel is not permitted to 'fish' for legal conclusions." *State v. Leroux*, 326 N.C. 368, 384, 390 S.E.2d 314, 325, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990) (quoting *State v. Phillips*, 300 N.C. 678, 682, 268 S.E.2d 452, 455 (1980)). Thus, the trial court acted within its discretion in sustaining the State's objection, and defendant's assignment of error is overruled.

[5] Defendant next contends the trial court erred by excusing for cause prospective jurors Coxe and Zirnheld, both of whom voiced objections regarding the application of the death penalty. A prospective juror may be excused for cause when "[a]s a matter of conscience, regardless of the facts and circumstances, [the juror] would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina." N.C.G.S. § 15A-1212(8) (2003). We recently reiterated the test for determining when a prospective juror should be excused for cause in *State v. Jones*:

The test . . . is whether his or her views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 849, (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)).

*State v. Jones*, 355 N.C. 117, 121, 558 S.E.2d 97, 100 (2002). Moreover, "the decision to excuse a prospective juror is within the discretion of the trial court because 'there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.' " *State v. Nobles*, 350 N.C. 483, 495, 515 S.E.2d 885, 893 (1999) (quoting *Wainwright v. Witt*, 469 U.S. at 425-26, 83 L. Ed. 2d at 851-52).

Though Coxe stated there were certain types of cases which warranted the imposition of the death penalty, the transcript reveals he remained unequivocal in his unwillingness to give proper weight to aggravators and in his preference for a life sentence over the death penalty. Likewise, although Zirnheld stated that he believed in the death penalty, he wavered when asked whether he could vote for the death penalty as a possible punishment. When pushed further by the prosecutor, Zirnheld responded "yes" when asked whether he was predisposed to vote for life imprisonment. In *State v. Simpson*, we held "excusals for cause may properly include persons who equivocate or who state that although they believe generally in the death penalty, they indicate that they personally would be unable or would find it difficult to vote for the death penalty." *State v. Simpson,* 341 N.C. 316, 342-43, 462 S.E.2d 191, 206 (1995), *cert. denied,* 516 U.S. 1161, 134 L. Ed. 2d 194 (1996). Therefore, we conclude the excusals of prospective jurors Coxe and Zirnheld were well within the sound discretion of the trial court, and defendant's assignment of error is overruled.

## GUILT-INNOCENCE PHASE

[6] Defendant next claims the trial court erred by admitting the out-of-court statements defendant made to two nurses while he received treatment at Pitt County Memorial Hospital on the night of 29 July 1999. In a pre-trial motion, defendant moved to suppress the statements, contending they were inadmissible because they were protected under the physician-patient privilege and were unreliable. Defendant now argues to this Court that the statements at issue were irrelevant and were inadmissible hearsay.

On 29 July 1999, defendant was in Pitt County Memorial Hospital receiving treatment for a self-inflicted gunshot wound to the head. Nurses Deborah Anderson and Diana Watson provided him with treatment to help him breathe after he became agitated. In order to determine whether he was cognizant, the nurses asked defendant if he knew where he was and why he was there. In response, defendant stated the following: "I shot myself. . . . I shot my wife and the kid. . . . [T]hey are both dead." Additionally, defendant replied "yes" when the nurses asked if he had been drinking. Defendant claims the trial court erred by admitting these statements into evidence.

Defendant argues that because other evidence proves he shot his wife and stepson, and that he was inebriated during the incident, his statements to the nurses are irrelevant because they are duplicative of other evidence. We agree with defendant's contention that his statements to the nurses are duplicative evidence. We disagree, however, with defendant's contention that duplicative evidence cannot be relevant. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2003). Defendant's statements that he shot his wife and stepson, and that he was drinking at the time make it more likely that he shot his wife and stepson and that he was inebriated when he shot them. Thus, we conclude that his statements are relevant.

[7] Defendant also argues that his statements to the two nurses were inadmissible hearsay. However, defendant failed to include his hearsay argument in his trial court motion to suppress or in his assignments of error before this Court. "In order to preserve a question for appellate review, a party must have presented to the trial court a timely request, objection or motion, *stating the specific grounds* for the ruling the party desired the court to make . . . ." N.C. R. App. P. 10(b)(1) (2004) (emphasis added). Also, "the scope of review on appeal is confined to a consideration of those assignments of error set out in the record on appeal . . . ." N.C. R. App. P. 10(a). Therefore, this argument is not properly before this Court. Defendant's assignment of error regarding admission of the statements in question is overruled.

Next, defendant claims the trial court erred by: (a) admitting an audiotape (State's Exhibit Number 80), (b) permitting a deputy

sheriff to render opinions he was not qualified to render, and (c) allowing the State's forensic psychiatry expert to state inadmissible opinions.

[8] Defendant contends that the trial court erroneously admitted into evidence, over his objections, an audiotape (State's Exhibit 80) found in a tape recorder at his home ten months after the murders took place. Defendant challenges the admissibility of this tape on the grounds that: (1) it was not properly authenticated; (2) it contained inadmissible hearsay, and (3) its probative value was substantially outweighed by the danger of unfair prejudice in violation of N.C.G.S. § 8C-1, Rule 403.

The evidence showed that the audiotape contained the voices of defendant and the two victims as they engaged in heated discussions at an unknown time. Testimony established the following circumstances of the tape's discovery and its subsequent chain of custody: Members of Benita's family closed the marital home in June 2000, ten months after the murders. Shirley Horne, Benita's niece, observed a tape recorder containing an audiotape in a desk in a room that Benita used as an office. Horne and Wendy Futrell, Benita's daughter, packed the tape recorder in a box. William Futrell moved the box to the house of Frances Williams, Benita's sister. Williams first listened to the tape in August 2000, after she unpacked the box containing the tape recorder.

After listening to the tape, Frances Williams carried it to Jo Williams, a legal assistant in the Onslow County District Attorney's office, and left it with her on 22 August 2000. Each person who handled or played the tape between its being discovered and its being placed in the custody of the District Attorney denied altering or changing the tape in any way. Defendant stipulated that the tape was delivered to the District Attorney and that the tape was not altered, changed or otherwise modified. Defendant also stipulated that Detective Bud Major at the Onslow County Sheriff's Department kept the tape unaltered, unchanged, or unmodified in any way until the trial.

Outside of the presence of the jury, defendant first objected for the purpose of ascertaining the reason underlying the State's desire to admit the tape. The prosecutor argued that he tendered the tape for the limited purpose of showing defendant had malice, intent, and ill will towards the victims. At this hearing, defendant initially stipulated that: (1) the audiotape was authentic because the State had a

witness who could testify to the voices on the tape, and (2) the tape was legally obtained because the witnesses who obtained the tape had a legal basis for packing up the house.

However, the next day, defendant requested that the trial court hold a *voir dire* hearing so the prosecution could present witness testimony regarding the tape's authenticity. Defendant further requested the trial court to make findings of fact and conclusions of law regarding the authenticity of the tape. During this hearing, defendant objected to the tape's admission under N.C.G.S. § 8C-1, Rule 403, contending that the highly prejudicial contents of the tape substantially outweighed its probative value.

The trial court denied defendant's Rule 403 objection and admitted the audiotape on the basis that the evidence was "relevant under the holding of State vs. M[u]rillo[,] 349 NC 573 to show malice, intent and ill will towards the victims." Defendant took exception to the trial court's decision. The jury returned to the courtroom and heard testimony regarding the discovery of the tape and its subsequent chain of custody. Over defendant's objection, the tape was played for the jury with limiting instructions that it was received "solely for the purpose of showing malice, intent and ill will towards the victims."

Defendant now argues that the trial court's order was based on erroneous findings of fact and erroneous conclusions of law. Defendant specifically challenges the following five findings of fact that supported the trial court's order admitting the tape:

4. Tape recording was made some time before July [1999] in the residence of the defendant [and] of the two deceased victims.

. . . .

6. Tape recorder was operating in close proximity to the victim— excuse me—to the defendant and the deceased victims so as to adequately pick up the voice levels of the defendant and the victims.

7. The defendant appeared to not be aware that he was being taped and his comments appeared to be spontaneous in nature.

. . . .

10. The recording accurately relates the conversations or statements on the tape.

. . . .

12. The tape is sufficiently intelligible.

Defendant specifically challenges as error the following three conclusions of law that also supported the order:

2. The tape recorder was capable of recording testimony and that it was operating properly at the time the conversation was recorded.

. . . .

5. That the recording is accurate and authentic.

6. That no changes, additions or deletions have been made since the tape has been made.

Defendant argues that the preceding five findings of fact were not supported by the record and that the conclusions of law were not supported by the trial court's findings of fact; therefore, he argues, the trial court erred. He asserts that the State failed to present evidence relating to the location and time of the recording, or recordings. Furthermore, defendant contends the State failed to present evidence to show whether the tape comprised one conversation or several conversations recorded over a period of time. Defendant also contends that in many instances, the voices are unintelligible and the only persons able to identify whether the recording accurately reflects the conversations are the persons participating in the conversations or the person or persons who recorded the tape.

Evidence is authentic if it conforms to Rule 901 of the North Carolina Rules of Evidence.[2] "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." N.C.G.S. § 8C-1, Rule 901(a) (2003). "Under Rule 901, testimony as to accuracy based on personal knowl-

---

2. The trial court appears to have made its findings of fact and conclusions of law in accordance with *State v. Lynch*, 279 N.C. 1, 17, 181 S.E.2d 561, 571 (1971). We note that in *State v. Stager*, this Court adopted N.C.G.S. § 8C-1, Rule 901 as the basis for analyzing the admissibility of an audiotape. 329 N.C. 278, 317, 406 S.E.2d 876, 898 (1991) (stating "the authentication requirements of Rule 901 have superseded and replaced the seven-pronged *Lynch* test"). Although the trial court applied the wrong test, it arrived at the correct conclusion: that the audiotape was authentic.

edge is all that is required to authenticate a tape recording, and a recording so authenticated is admissible if it was legally obtained and contains otherwise competent evidence." *State v. Stager*, 329 N.C. 278, 317, 406 S.E.2d 876, 898 (1991). We conclude that the testimony during the *voir dire* hearing was sufficient to establish the accuracy of the tape, demonstrate that it was legally obtained, and support a finding that the tape contained competent evidence of defendant's malice, intent and ill will towards the victims. Therefore, the prosecutor properly authenticated the audiotape.

**[9]** Defendant also argues that the conversations on the tape constituted inadmissible hearsay. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C.G.S. § 8C-1, Rule 801(c) (2003). In the case at bar, the prosecution sought to introduce the tape to show defendant had malice, intent and ill will towards the victims and not for the truth of the matter asserted therein. Because the audiotape was not admitted to show that the statements contained therein were true, the trial court did not err by admitting the audiotape.

**[10]** Lastly, defendant argues that the audiotape's contents were more prejudicial than probative and that the trial court erred by not excluding the tape's contents under N.C.G.S. § 8C-1, Rule 403. Rule 403 states that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." N.C.G.S. § 8C-1, Rule 403 (2003). "Relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401.

The decision "to exclude evidence under Rule 403 is a matter left to the sound discretion of the trial court." *Stager*, 329 N.C. at 308, 406 S.E.2d at 893. "[T]he trial court's ruling should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " *State v. Hyde*, 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001) (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).

In the case at bar, the evidence was admitted for the limited purpose of showing that defendant had malice, intent, and ill will towards the victims. "We consistently have allowed evidence span-

ning the entire marriage when a husband is charged with murdering his wife in order 'to show malice, intent and ill will towards the victim.' " *State v. Murillo*, 349 N.C. 573, 591, 509 S.E.2d 752, 763 (1998), *cert. denied*, 528 U.S. 838, 145 L. Ed. 2d 87 (1999) (quoting *State v. Braswell*, 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985)) *quoted in State v. Lynch*, 327 N.C. 210, 219, 393 S.E.2d 811, 816 (1990). Therefore, the trial court did not abuse its discretion in admitting evidence of the entire pattern and history of violence between defendant and the victims. Defendant's assignment of error regarding the admission of the audiotape is overruled.

**[11]** Next, defendant argues the trial court erroneously admitted opinion testimony from Lieutenant Richard Sutherland of the Onslow County Sheriff's Department. Defendant contends Sutherland was unqualified to render an expert opinion that, based on the blood on the clothing of the victims, Benita was shot first, followed by Marvin. Defendant also complains that Sutherland was unqualified to testify that Marvin was shot while he was in a defensive position.

Defendant failed to object at trial to the admission of Sutherland's testimony; thus, we must review this assignment of error under the plain error rule. *State v. Bishop*, 346 N.C. 365, 385, 488 S.E.2d 769, 779 (1997). Under the plain error standard of review, defendant has the burden of showing: "(i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial." *Id.*

Lieutenant Sutherland testified that he was a forensic investigator for three and a half years with the Onslow County Sheriff's Department. His duties included conducting crime scene investigations, preserving physical evidence, and assisting in analysis and presentation of the evidence for court. Sutherland testified that he had investigated over five hundred cases, ten to fifteen of which were homicide cases. In addition to his on-the-job training, his formal education included basic law enforcement school and classroom training.

The prosecution concedes Lieutenant Sutherland was never formally tendered as an expert witness. However, in *State v. White*, we held that although "the better practice may be to make a formal tender of a witness as an expert, such a tender is not required." *State v. White*, 340 N.C. 264, 293, 457 S.E.2d 841, 858, *cert. denied*, 516 U.S. 994, 133 L. Ed. 2d 436 (1995). A review of the record reveals that

the trial court implicitly found Sutherland to be an expert in crime scene investigation and admitted his testimony under N.C.G.S. § 8C-1, Rule of Evidence 702(a), which reads:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.G.S. § 8C-1, Rule 702(a) (2003). Sutherland's experience, the nature of his job, and his personal investigation of the crime scene at issue here qualified him to offer expert testimony to demonstrate how the crime scene was found after the police arrived.

We find no evidence in the transcript that Lieutenant Sutherland opined that the blood on Benita's socks originated from Marvin or that Benita was shot first. Sutherland testified that "neither the blood on either of [Benita's] socks, either the drops or the transfer blood, are consistent with having originated from her injuries." This neither implies nor suggests that the blood on Benita's socks originated from Marvin. This testimony merely states that the blood on Benita's socks did not originate from her own injuries. This testimony is proper because as an expert witness, Sutherland is permitted to offer "scientific, technical or other specialized knowledge" to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

Defendant's contention that it was improper for the trial court to allow Sutherland to testify about the position of Marvin's arms and legs is also without merit for the reasons stated above. As an expert in crime scene investigation, Sutherland's testimony was properly admitted to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

Because we conclude that the trial court implicitly found Sutherland to be an expert, Sutherland's testimony was admissible as expert testimony, and defendant has failed to show that the admission of Sutherland's opinion testimony amounted to error, much less plain error. Therefore, defendant's assignment of error is overruled.

[12] Defendant next argues the trial court erred in allowing James Groce, M.D., an expert in forensic psychiatry, to testify to the on-call physician's observations of defendant's mental status upon defendant's admission to Dorothea Dix Hospital for psychiatric evaluation on 16 October 2000. Defendant also argues that Dr. Groce should not

have been allowed to render an opinion regarding defendant's state of mind on the night of the murders. Dr. Groce testified as a rebuttal witness for the State.

Defendant failed to object at trial to the admission of Dr. Groce's testimony. Because defendant failed to object, he "has the burden of showing that the error constituted plain error, that is, (i) that a different result probably would have been reached but for the error or (ii) that the error was so fundamental as to result in a miscarriage of justice or denial of a fair trial." *Bishop*, 346 N.C. at 385, 488 S.E.2d at 779.

Defendant argues that Dr. Groce's testimony about defendant's mental status on 16 October 2000 was inadmissible hearsay. Dr. Groce first interviewed defendant on 17 October 2000, the day after defendant was admitted to the hospital. To prepare for that interview, Dr. Groce relied on the admitting physician's notes stating that defendant did not report any delusions, was logical in his presentation of information, and was coherent.

Dr. Groce testified about the admitting physician's out-of-court statements in order to provide the jury the information he relied upon to form his opinion of defendant's state of mind. An expert may testify about the information he relied upon in forming his opinion so long as the information is of a type reasonably relied upon by experts in his field. N.C.G.S. § 8C-1, Rule 703 (2003). "[T]estimony as to information relied upon by an expert when offered to show the basis for the expert's opinion is not hearsay, since it is not offered as substantive evidence." *State v. Huffstetler*, 312 N.C. 92, 107, 322 S.E.2d 110, 120 (1984), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169-70 (1985). Therefore, the trial court did not commit error, much less plain error, by allowing Dr. Groce to make use of the admitting physician's notes, in addition to his own personal observations, to form his expert opinion.

[13] Defendant further complains that Dr. Groce should not have been allowed to render an opinion of defendant's mental state at the time of the murders because Dr. Groce did not meet with defendant until 17 October 2000, more than a year after the murders took place. Based on his interviews with defendant on 17 October and 20 October 2000, Dr. Groce testified, without objection, that in his expert opinion defendant had the mental capacity on 24 July 1999 to form specific intent and that defendant "would have been able to make and carry out plans at that time." Defendant also contends that Dr. Groce's fail-

ure to review defendant's medical records from his month-long stay at Pitt Memorial Hospital after the night of the shootings renders Dr. Groce's opinion inadmissible.

Review of the record in this case reveals that the trial court did not commit plain error in admitting the now challenged testimony from Dr. Groce. He also testified that during the second interview, defendant related that he had "bits and pieces" of memory about the day of the murders. Dr. Groce testified that during his second interview with defendant, Dr. Groce asked defendant to clarify some of the things defendant had said in their prior interview. Nonetheless, in response to Dr. Groce's follow-up questions, defendant was able to clarify the events as they transpired on the day of the murders. Based on both interviews, his personal observations of defendant, and his review of reports prepared by the defense and the State, Dr. Groce rendered his expert opinion that on 24 July 1999, defendant's mental functioning "would have been well enough at that time that he would have been able to form that specific intent." Dr. Groce further testified that defendant "would have been able to make and carry out plans at that time."

We conclude that the trial court did not err by admitting Dr. Groce's testimony under N.C.G.S. § 8C-1, Rule 702. "Rule 702 provides that a witness qualified as an expert may testify in the form of an opinion if it will assist the trier of fact in understanding the evidence. The rule does not require that an opinion be based on a personal interview." *State v. Daniels*, 337 N.C. 243, 269, 446 S.E.2d 298, 314 (1994), *cert. denied*, 513 U.S. 1135, 130 L. Ed. 2d 895 (1995). In the case *sub judice*, Dr. Groce had ample information to form his opinion regarding defendant's mental state. Therefore, defendant's assignment of error is overruled.

Next we address defendant's complaint that portions of the prosecutors' closing arguments in the guilt-innocence phase of defendant's trial were improper.

Defense counsel failed to object during the prosecutors' closing arguments. This Court has previously set the standard of review under such circumstances as follows:

> The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene

STATE v. JONES

[358 N.C. 330 (2004)]

*ex mero motu. State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, 528 U.S. 835, 145 L. Ed. 2d 80 (1999). In other words, the reviewing court must determine whether the argument in question strayed far enough from the parameters of propriety that the trial court, in order to protect the rights of the parties and the sanctity of the proceedings, should have intervened on its own accord and: (1) precluded other similar remarks from the offending attorney; and/or (2) instructed the jury to disregard the improper comments already made.

*Jones*, 355 N.C. at 133, 558 S.E.2d at 107.

"[C]ounsel are given wide latitude in arguments to the jury and are permitted to argue the evidence that has been presented and all reasonable inferences that can be drawn from that evidence." *State v. Richardson*, 342 N.C. 772, 792-93, 467 S.E.2d 685, 697, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996). However, "counsel may not, by argument or cross-examination, place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs and personal opinions not supported by the evidence." *State v. Locklear*, 294 N.C. 210, 217, 241 S.E.2d 65, 69 (1978).

**[14]** Defendant contends that during the State's closing argument, the prosecutors improperly disparaged defense counsel in an effort to shift the focus from determination of defendant's guilt or innocence to degradation of defense counsel, thus making statements unsupported by evidence. The prosecution's closing argument included the following statements:

> The evidence proves beyond a reasonable doubt that this particular defendant did these things, and don't let his lawyers get up here and attempt to blame something called alcoholism or attempt to blame low I.Q. or attempt to blame anything else for these acts, . . . .
>
> . . . . .
>
> Now, [defense counsel] can come up here all, with all the excuses they want about low I.Q.[,] about alcohol, about dimished [sic] capacity. The truth is this defendant intentionally, with specific intent to kill, pulled the trigger against those two individuals. . . . It's not because of alcohol; it's not because of low I.Q.; it's not because of dimished [sic] capacity, [it's] because he chose to do this, and ladies and gentlemen, don't let [defense counsel] get away with that.

STATE v. JONES

[358 N.C. 330 (2004)]

We conclude that the prosecutors' remarks were not improper because they were arguing reasonable inferences drawn from the evidence. Furthermore, we find that the prosecution did not personally disparage opposing counsel by making the comments to which defense counsel failed to object. *State v. Gaines*, 345 N.C. 647, 675, 483 S.E.2d 396, 413, *cert. denied*, 522 U.S. 900, 139 L. Ed. 2d 177 (1997).

At trial, defendant's counsel argued that because defendant's capacity was diminished, defendant did not have the specific intent to kill the victims. To show diminished capacity, defense counsel introduced evidence of defendant's low I.Q. and evidence that defendant was intoxicated on the evening of 24 July 1999. The prosecutors' comments in closing argument about defendant's I.Q. and intoxication were not improper because these comments countered defense counsel's argument that defendant did not have the requisite intent to kill on the night in question. As we stated above, the prosecutor argued reasonable inferences drawn from the evidence and thus stayed within the parameters of proper closing arguments.

[15] Defendant next contends the following statements made by the prosecution in closing argument improperly implied defendant's expert was paid to intentionally hide unfavorable information:

Now, [defense counsel] can call every psychologist in the world, pay them all to come in here and say he didn't have a specific intent to kill.

. . . .

[T]he psychologist only writes down things apparently favorable to the defendant.

. . . .

[Dr. Noble] never ask[ed] the defendant, the one who pulled the trigger[,] "why did you pull the trigger. Why did you shoot them?" He never asked him that. Apparently he didn't want to know the answer.

. . . .

[Dr. Noble] had the word loaded crossed out [of his notes] because it wasn't favorable to his client.

Defendant also contends the prosecutor improperly argued that defendant's expert concealed information and was paid to do so.

However, this Court has rejected similar challenges in past cases. *See, e.g., State v. May*, 354 N.C. 172, 180-81, 552 S.E.2d 151, 157 (2001), *cert. denied*, 535 U.S. 1060, 152 L. Ed. 2d 830 (2002); *State v. Cummings*, 352 N.C. 600, 626, 536 S.E.2d 36, 55 (2000), *cert. denied*, 532 U.S. 997, 149 L. Ed. 2d 641 (2001). Although we do not condone the prosecutor's argument that the defense's expert witness "only writes down things apparently favorable to" his client, we conclude that the prosecutor's comments "are not so grossly improper that the trial court erred when it failed to intervene *ex mero motu*." *State v. Barden*, 356 N.C. 316, 358, 572 S.E.2d 108, 135 (2002), *cert. denied* —— U.S. ——, 155 L. Ed. 2d 1074 (2003). Defendant's assignment of error is overruled.

## SENTENCING PROCEEDING

**[16]** Defendant argues that the trial court erred by submitting the "course of conduct" aggravating circumstance for both murders. N.C.G.S. § 15A-2000(e)(11) (2003). Defendant contends that because the victims were killed at approximately the same time, the jury must have relied on the same evidence to find the course of conduct aggravating factor for each murder. In *State v. Cummings*, we held "the closer the incidents of violence are connected in time, the more likely that the acts are part of a plan, scheme, system, design or course of action." 332 N.C. 487, 510, 422 S.E.2d 692, 705 (1992). "[I]n order to find course of conduct, a court must consider the circumstances surrounding the acts of violence and discern some connection, common scheme, or some pattern or psychological thread that ties them together." *Id.* Moreover, the fact that the victims were related to each other and to the accused supports submission of the course of conduct aggravator. *Id.* at 511, 422 S.E.2d at 706.

The rationale in *Cummings* applies to the case at bar. Here, defendant shot and killed his wife and then killed his stepson. Thus, there exists separate evidence upon which the jury can rely for each murder. Moreover, we have consistently held that a jury may find the N.C.G.S. § 15A-2000(e)(11) aggravating circumstance where defendant killed more than one victim. *See, e.g., State v. Walters*, 357 N.C. 68, 112, 588 S.E.2d 344, 370, *cert. denied*, —— U.S. ——, 157 L. Ed. 2d 320 (2003); *State v. Conaway*, 339 N.C. 487, 530, 453 S.E.2d 824, 851, *cert. denied*, 516 U.S. 884, 133 L. Ed. 2d 153 (1995). Therefore, we conclude that the trial court did not err by submitting the course of conduct aggravating factor for each murder.

**[17]** Next, defendant contends the trial court erroneously submitted the "especially heinous, atrocious, or cruel" aggravating circumstance for the murder of Marvin Thomas. N.C.G.S. § 15A-2000(e)(9) (2003). However, this Court has remained steadfast in upholding the submission of the (e)(9) aggravating circumstance when a parental relationship exists between the victim and the accused. *See, e.g., State v. Anderson,* 350 N.C. 152, 186, 513 S.E.2d 296, 316, *cert. denied,* 528 U.S. 973, 145 L. Ed. 2d 326 (1999); *State v. Flippen,* 349 N.C. 264, 270, 506 S.E.2d 702, 706 (1998); *State v. Elliott,* 344 N.C. 242, 280, 475 S.E.2d 202, 219 (1996), *cert. denied,* 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). "The victim's age and the existence of a parental relationship between the victim and the defendant may also be considered in determining the existence of the especially heinous, atrocious, or cruel circumstance." *Elliott,* 344 N.C. at 280, 475 S.E.2d at 219.

"A murder is especially heinous, atrocious, or cruel when it is a 'conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" *Walters,* 357 N.C. at 98, 588 S.E.2d at 362 (quoting *State v. Dixon,* 283 So. 2d 1 (Fla.) (1973), cert. denied, 416 U.S. 943, 40 L. Ed. 2d 295 (1974)), *quoted in Flippen,* 349 N.C. at 270, 506 S.E.2d at 706 (1998). Moreover, we have upheld submission of the especially heinous, atrocious, or cruel aggravating factor in those cases that "involve infliction of psychological torture by leaving the victim in his last moments aware of but helpless to prevent impending death." *State v. Hamlet,* 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984).

The evidence demonstrates that defendant shot Marvin's mother in the chest with a shotgun, spraying blood onto Marvin who sat on the same couch. Then defendant pulled the trigger and shot his stepson. Though defendant was not Marvin's biological father, Marvin had been known to call defendant "dad." Because of the existence of the parental relationship, and because Marvin was "aware of but helpless to prevent [his] impending death," *id.,* in close proximity to the horrific murder of his mother, the murder of Marvin was "conscienceless" and "unnecessarily torturous." *Walters,* 357 N.C. at 98, 588 S.E. 2d at 362. Thus, the trial court did not err by submitting the (e)(9) aggravating factor.

**[18]** Additionally, defendant contends the especially heinous, atrocious, or cruel aggravating circumstance (N.C.G.S. § 15A-2000(e)(9)) submitted for the murder of Marvin Thomas completely overlapped the course of conduct aggravating factor (N.C.G.S. § 15A-2000(e)(11)). "A jury may not consider two aggravating cir-

cumstances when one completely overlaps the other." *State v. Miller*, 357 N.C. 583, 593, 588 S.E.2d 857, 865 (2003). However, "[w]hile a complete overlap is impermissible, some overlap in the evidence supporting each aggravating circumstance is permissible." *Id.* at 595, 588 S.E.2d at 866.

We conclude that ample evidence exists to support each aggravating factor. For example, the evidence indicating defendant killed Marvin minutes after he killed Benita supports the course of conduct aggravating factor for each murder. *Cummings*, 332 N.C. at 510, 422 S.E.2d at 705. The evidence that Marvin was only fourteen years old and that defendant was a father-figure to Marvin supports submission of the especially heinous, atrocious, or cruel aggravating factor. *Anderson*, 350 N.C. at 186, 513 S.E.2d at 316. Thus, defendant's assignment of error is overruled.

[19] Defendant also contends that the course of conduct aggravating circumstance is unconstitutionally vague. However, we have consistently held to the contrary. *See, e.g., State v. Williams*, 305 N.C. 656, 685, 292 S.E.2d 243, 260-61, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982). We find no reason to depart from our prior holdings. Therefore, we overrule defendant's assignment of error.

Next, defendant contends the trial court made several errors during the prosecutor's sentencing proceeding closing argument.

[20] First, defendant claims the trial court erred by allowing the prosecutor to give a limiting instruction related to an audiotape containing heated discussions between defendant and the victims. In the guilt/innocence phase, the trial court admitted this tape for the sole purpose of showing defendant's ill will towards the victims. The tape was not admitted as substantive evidence.

The prosecutor attempted to play the tape again during his closing argument at the sentencing phase. Once the prosecutor began to play the tape, defendant objected on the grounds that the tape was not admitted as substantive evidence. The prosecutor and defense counsel then approached the bench, whereupon defense counsel requested an instruction that the tape was only admitted for the limited purposes of showing motive and intent and that the tape was not admitted for the purpose of showing the taped statements were true. The prosecutor then said he would notify the jury that the tape was not admitted as substantive evidence. The trial court then stated, "I'll let [the prosecutor] cure it that way. If he does not, then I will." Next,

**STATE v. JONES**

[358 N.C. 330 (2004)]

the prosecutor told the jury that the tape was offered solely "to show [defendant's] malice, intent and ill will" towards the victims.

Defendant contends the prosecutor did not properly cure his own error. We disagree. Defendant objected to the prosecutor's playing the audiotape on the grounds that the jury could have believed the tape was substantive evidence. We conclude that the prosecutor cured any potential error by instructing the jury that the tape was not substantive evidence, but was admitted solely "to show malice, intent and ill will" towards the victims.

Defendant further contends the trial court improperly expressed bias in favor of the prosecution when choosing the manner in which the jury would be informed of the specific purposes for which the tape could be considered. Instead of personally instructing the jury on this matter, the trial court allowed the prosecutor to "cure" his own error directly with the jury. However, at trial defendant did not object to the prosecutor "curing" his own error. Therefore, we must determine whether the trial court committed a gross impropriety by allowing the prosecutor to instruct the jury on the limited admissibility of the tape. *Barden*, 356 N.C. at 358, 572 S.E.2d at 135.

The trial court "may not express during any stage of the trial, any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (2003). "Also, an alleged improper statement will not be reviewed in isolation, but will be considered in light of the circumstances in which it was made. Furthermore, defendant must show that he was prejudiced by a judge's remark." *State v. Weeks*, 322 N.C. 152, 158, 367 S.E.2d 895, 899 (1988) (internal citations omitted).

However, "a trial court generally is not impermissibly expressing an opinion when it makes ordinary rulings during the course of the trial." *Id.* In the instant case, the trial court merely required the prosecutor to keep his argument within the bounds of the law. We conclude that the trial court made an "ordinary ruling[] during the course of the trial," *id.*, and hence, defendant was not prejudiced by the ruling. Moreover, contrary to defendant's contentions, the trial court did not intimate favoritism towards the State. Although the trial court allowed the prosecutor to cure any potential error, the trial court made this decision at a bench conference which the jury did not hear. Because the jury had no knowledge of the trial court's decision, we will not conclude that the decision inevitably prejudiced defendant. Defendant's assignment of error is overruled.

**[21]** Next, defendant argues he was prejudiced by the prosecutor's sentencing phase closing argument because the prosecutor stated that Benita was shot first, used sound effects of a gun firing, asked jurors to put themselves in the place of the victims, and disparaged defendant's expert witness. Because defendant did not object to the prosecutor's closing argument, we must determine "whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero moto*." *Jones*, 355 N.C. at 133, 558 S.E.2d at 107.

In a capital trial, the prosecutor "is permitted to argue the facts which have been presented, as well as reasonable inferences which can be drawn therefrom." *State v. McCollum*, 334 N.C. 208, 223, 433 S.E.2d 144, 152 (1993), *cert. denied*, 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). The prosecutor stated that defendant shot Benita before he shot Marvin. Defendant argues that the evidence does not show defendant shot Benita first. However, defendant's expert witness, Dr. Noble, testified that defendant stated in an interview that defendant "believed that B[e]nita was shot first." Moreover, Lieutenant Sutherland proffered testimony regarding the crime scene which could lead to the reasonable inference that Benita was shot before Marvin. Therefore, it was not improper for the prosecutor to argue the inference that defendant shot Benita before he shot Marvin.

**[22]** The prosecutor twice used the sound effect of a gun firing during his closing argument. Defendant also complains that the prosecutor used these sound effects while holding the shotgun defendant used to kill the victims.

During the sentencing phase of the trial, the jury may not be influenced by "passion, prejudice, or any other arbitrary factor." N.C.G.S. § 15A-2000(d)(2) (2003). "While the melodrama inherent to closing argument might well inspire some attorneys to favor stage theatrics over reasoned persuasion, such preference cannot be countenanced . . . ." *Jones*, 355 N.C. at 135, 558 S.E.2d at 109. Although we do not condone the prosecutor's use of gunshot sound effects during his closing argument, we conclude that his actions were not "so grossly improper that the trial court erred in failing to intervene *ex mero motu*." *Barden*, 356 N.C. at 358, 572 S.E.2d at 135. Defendant's assignment of error is overruled.

**[23]** We next address defendant's argument that the prosecutor erred by asking the jurors to place themselves in place of the victims. A prosecutor may not ask the jury to " 'put themselves in place of the

victims.' " *State v. McCollum*, 334 N.C. at 224, 433 S.E.2d at 152 (quoting *United States v. Pichnarcik*, 427 F.2d 1290, 1292 (9th Cir. 1970)).

The record indicates that, although the prosecutor repeatedly asked the jury to imagine what the victims were thinking, he never asked the jury to put themselves in the victims' positions. We have consistently found such requests to imagine what the victims were thinking to be proper. *See, e.g., State v. Miller*, 357 N.C. at 597, 588 S.E.2d at 867. Therefore, we conclude that the prosecutor's requests for the jury to imagine what the victims were thinking were not "so grossly improper that the trial court erred in failing to intervene *ex mero motu.*" *Barden*, 356 N.C. at 358, 572 S.E.2d at 135.

**[24]** Additionally, defendant argues that during closing argument, the prosecutor disparaged Dr. Noble, defendant's expert witness. At trial, Dr. Noble testified that he had an ethical responsibility to ensure psychological test materials were not released to untrained, unqualified individuals and that the adult intelligence scale and MMPI-2 carry a warning that only qualified psychologists may use and interpret them. On cross-examination, Dr. Noble reviewed some of the questions and statements that were presented to defendant during testing and provided defendant's responses to the jury. Dr. Noble testified that one of the statements on the MMPI-2 was "I'll do something desperate to prevent a person I love from abandoning me" and that defendant's response was "True." Based on this evidence the prosecutor argued:

> And you heard their own psychologist. All these witnesses, I would contend or State contends, were pretty honest to you except that man. He sat there and said, told Mr. Paramore I don't want to give you this psychological I.Q. testing because you folks won't understand. Well, MMPI—excuse me. You all won't understand. What in the world couldn't you understand about the one question—Would you do something drastic if your family were about to abandon you? Yes. What was it that you folks are not smart enough to understand about that? Well, maybe he just didn't want you to know about that.

Counsel "may not become abusive" during closing argument. N.C.G.S. § 15A-1230(a) (2003); *Jones*, 355 N.C. at 127, 558 S.E.2d at 104 (quoting N.C.G.S. § 15A-1230(a) (1999)). However, "it is not improper for the prosecutor to impeach the credibility of an expert during his closing argument." *State v. Norwood*, 344 N.C. 511, 536, 476 S.E.2d 349, 361 (1996), *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1997).

In this passage from the prosecutor's closing argument, the prosecutor was not abusive. Rather, the prosecutor attempted to impeach the expert witness's credibility. In his argument the prosecutor emphasized that Dr. Noble said testing data should not be turned over to unqualified persons, meaning—by reasonable inference—the jury. Then the prosecutor pointed out an inference that could reasonably be drawn from a test question and answer that were reviewed on cross-examination—data that seemed to be well within the grasp of jury members, but unfavorable to defendant's theory of the case. We conclude that the prosecutor properly argued the evidence in an attempt to impeach Dr. Noble's credibility and that the prosecutor neither exceeded the bounds allowed in capital sentencing proceedings nor violated the scope of permissible prosecutorial conduct.

**[25]** Defendant asserts next that the trial court committed reversible constitutional error by failing to include the words "without parole" when describing the sentence of life imprisonment as an alternative to the death sentence. Defendant admits that the trial court correctly stated that "[a] sentence of life imprisonment means a sentence of life without parole" at the beginning of the jury charge, but contends that later during the jury charge, the court merely said "life in prison." Defendant argues the trial court erred by failing to instruct the jury adequately that "life in prison means life in prison without parole."

In *State v. Davis*, this Court concluded that N.C.G.S. § 15A-2002 does not require the trial judge to use the words "without parole" in each instance he describes a life sentence. "We find nothing in the statute that requires the judge to state 'life imprisonment without parole' every time he alludes to or mentions the alternative sentence." *State v. Davis*, 353 N.C. 1, 41, 539 S.E.2d 243, 269 (2000), *cert. denied*, 534 U.S. 839, 151 L. Ed. 2d 55 (2001).

N.C.G.S. § 15A-2002 provides in pertinent part: "The judge shall instruct the jury, in words substantially equivalent to those of this section, that a sentence of life imprisonment means a sentence of life without parole." N.C.G.S. § 15A-2002 (2003). Here, in instructing the jury, the trial court stated the following:

> All right, Members of the Jury, having found the defendant guilty of murder in the first degree, it is now your duty to recommend to the Court whether the defendant should be sentenced to death or to life imprisonment. A sentence of life imprisonment means a sentence of life without parole.

STATE v. JONES

[358 N.C. 330 (2004)]

Thus, the trial court met the statutory requirement, and defendant's assignment of error is overruled.

## PRESERVATION ISSUES

Defendant raises additional issues that he concedes this Court has previously decided against him. First, defendant claims the trial court erred by denying his motion to require the State to disclose the criminal records of all witnesses. However, we have previously rejected this argument. *See, e.g., State v. Gibson,* 342 N.C. 142, 149-50, 463 S.E.2d 193, 198 (1995).

Defendant also argues the trial court erred by denying his motion to prevent the State from relying on the N.C.G.S. § 15A-2000(e)(11) course of conduct aggravating factor. Defendant contends N.C.G.S. § 15A-2000(e)(11) is unconstitutionally vague. However, as discussed earlier in this opinion, we have previously rejected this claim. *See, e.g., Williams,* 305 N.C. at 684-85, 292 S.E.2d at 260-61.

Additionally, defendant argues that, in violation of his constitutional rights, the murder indictments failed to allege all the elements of first-degree murder and all the aggravating circumstances to be applied at the capital sentencing hearing. However, we previously rejected this claim. The failure to include all aggravating circumstances in an indictment "violates neither the North Carolina nor the United States Constitution." *State v. Hunt,* 357 N.C. 257, 278, 582 S.E.2d 593, 607, *cert. denied,* —— U.S. ——, 156 L. Ed. 2d 702 (2003). The elements of first-degree murder need not be charged. *State v. Wallace,* 351 N.C. 481, 508, 528 S.E.2d 326, 343, *cert. denied,* 531 U.S. 1018, 148 L. Ed. 2d 498 (2000).

Next, defendant argues the trial court erred by denying defendant's motion for Individual *Voir Dire* and Sequestration of Jurors During *Voir Dire.* However, we rejected this argument in *State v. Burke,* holding that such decisions are within the trial court's discretion. 342 N.C. 113, 121-22, 463 S.E.2d 212, 217-18 (1995).

Additionally, defendant argues North Carolina's death penalty statute is unconstitutional, arbitrary and discriminatory on its face and that applying it in this case constitutes cruel and unusual punishment. However, we have previously rejected this argument. *See, e.g., State v. Garner,* 340 N.C. 573, 605, 459 S.E.2d 718, 735 (1995), *cert. denied,* 516 U.S. 1129, 133 L. Ed. 2d 872 (1996).

Next, defendant argues the trial court erred by using the terms "satisfaction" and "satisfy" when instructing the jury on the burden of

**STATE v. JONES**

[358 N.C. 330 (2004)]

proof required to find that a given mitigating circumstance exists. Defendant argues that the trial court's instructions allowed jurors to establish for themselves the legal standard to be applied to evidence of mitigating circumstances. However, we have previously considered and rejected this argument. *See, e.g., State v. Payne,* 337 N.C. 505, 531-33, 448 S.E.2d 93, 108-09 (1994), *cert. denied,* 514 U.S. 1038, 131 L. Ed. 2d 292 (1995).

Next, defendant argues that the trial court erred in its instructions to the jury by stating that the jury had a "duty" to recommend death. Defendant argues the trial court's instruction precluded jurors from considering a sentence of life in prison. However, we have previously considered and rejected this argument. *See, e.g., State v. Thomas,* 350 N.C. 315, 363-64, 514 S.E. 2d 486m 515-16 (1999).

Defendant next argues the trial court erred by using the word "unanimously" in three of the questions appearing on the "Issues and Recommendation as to Punishment" form. Defendant claims the trial court improperly used the word "unanimously" in questions listed under the following three issues:

[Issue One]　Do you *unanimously* find from the evidence, beyond a reasonable doubt, the existence of the following aggravating circumstance?

. . . .

[Issue Three]　Do you *unanimously* find beyond a reasonable doubt that the mitigating circumstance or circumstances found is, or are, insufficient to outweigh the aggravating circumstance found by you?

[Issue Four]　Do you *unanimously* find beyond a reasonable doubt that the aggravating circumstance you found is sufficiently substantial to call for the imposition of the death penalty when considered with the mitigating circumstance or circumstances found by one or more of you?

(Emphasis added.) Defendant contends that these instructions prejudiced him by precluding jurors from considering a sentence of life in prison. However, we have previously rejected defendant's argument in *State v. McCarver,* 341 N.C. 364, 388-94, 462 S.E.2d 25, 38-42 (1995), *cert. denied,* 517 U.S. 1110, 134 L. Ed. 2d 482 (1996).

Defendant next contends the trial court erred by instructing the jury during sentencing that "each juror *may* consider any mitigating circumstance or circumstances that he or she determine to exist by a preponderance of the evidence in issue two." (Emphasis added.) Defendant argues that the use of the word "may" in these instructions permits jurors to ignore established mitigation evidence. Defendant also argues that the trial court's instruction precluded a juror from considering mitigating evidence found by any other juror. However, we have repeatedly considered and rejected these arguments. *See, e.g., State v. McNeill,* 349 N.C. 634, 653, 509 S.E.2d 415, 426 (1998), *cert. denied,* 528 U.S. 838, 145 L. Ed. 2d 87 (1999); *State v. Green,* 336 N.C. 142, 175, 443 S.E.2d 14, 33-34, *cert. denied,* 513 U.S. 1046, 130 L. Ed. 2d 547 (1994).

Finally, defendant contends the trial court erred by denying his motion to prohibit the prosecution from death qualifying the jury. However, this Court has previously rejected defendant's argument. *See, e.g., State v. Hyatt,* 355 N.C. 642, 669, 566 S.E.2d 61, 78 (2002), *cert. denied,* 537 U.S. 1133, 154 L. Ed. 2d 823 (2003).

We see no reason to depart from our prior holdings. Therefore, defendant's assignments of error which relate to his preservation issues are overruled.

## PROPORTIONALITY REVIEW

[26] Having found no error in either the guilt/innocence phase or the sentencing proceeding of defendant's trial, we must determine whether: (1) the evidence supports the aggravating circumstances found by the jury; (2) passion, prejudice, or any other arbitrary factor influenced the imposition of the death sentence; and (3) the death sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of two counts of first-degree murder on the basis of malice, premeditation, and deliberation. With respect to each murder, the jury found the aggravating circumstance that the murder "was part of a course of conduct in which the defendant engaged and which included the commission by the defendant of other crimes of violence against another person or persons." N.C.G.S. § 15A-2000(e)(11). With respect to defendant's murder of Marvin Thomas, the jury found as an additional aggravating circumstance that the murder was "especially heinous, atrocious,

or cruel." N.C.G.S. § 15A-2000(e)(9). After reviewing the records, transcripts, briefs, and oral arguments, we conclude that the evidence supports all of the aggravating circumstances for each murder.

Additionally, we conclude, based on a thorough review of the record, that the sentences of death were not imposed under the influence of passion, prejudice, or any other arbitrary factor. Thus, the final statutory duty of this Court is to conduct a proportionality review.

Proportionality review is designed "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). In conducting proportionality review, we determine whether "the sentence of death in the present case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant." *State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983); *see* N.C.G.S. § 15A-2000(d)(2). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *State v. Green*, 336 N.C. at 198, 443 S.E.2d at 47 (*quoting Williams*, 308 N.C. at 81, 301 S.E.2d at 355).

This Court has determined that the death sentence was disproportionate in eight cases. *State v. Kemmerlin*, 356 N.C. 446, 489, 573 S.E.2d 870, 898 (2002); *State v. Benson*, 323 N.C. 318, 328, 372 S.E.2d 517, 523 (1988); *State v. Stokes*, 319 N.C. 1, 27, 352 S.E.2d 653, 668 (1987); *State v. Rogers*, 316 N.C. 203, 237, 341 S.E.2d 713, 733 (1986), *overruled in part on other grounds by State v. Gaines*, 345 N.C. 647, 676-77, 483 S.E.2d 396, 414 (1997), and *by State v. Vandiver*, 321 N.C. 570, 573-74, 364 S.E.2d 373, 375-76 (1988); *State v. Young*, 312 N.C. 669, 691, 325 S.E.2d 181, 194 (1985); *State v. Hill*, 311 N.C. 465, 479, 319 S.E.2d 163, 172 (1984); *State v. Bondurant*, 309 N.C. 674, 693, 309 S.E.2d 170, 183 (1983); and *State v. Jackson*, 309 N.C. 26, 46, 305 S.E.2d 703, 717 (1983).

However, each of these eight cases is distinguishable from the present case. First, in the present case, defendant was convicted of two counts of first-degree murder. This Court has "never found the sentence of death disproportionate in a case where the defendant was found guilty of murdering more than one victim." *State v. Davis*, 349 N.C. 1, 60, 506 S.E.2d 455, 488 (1998), *cert. denied*, 526 U.S. 1161, 144 L. Ed. 2d 219 (1999).

In *Young*, 312 N.C. at 691, 325 S.E.2d at 194, this Court noted that the jury failed to find the especially heinous, atrocious, or cruel aggravating circumstance. However, in the case at bar, the jury found the especially heinous, atrocious, or cruel aggravating circumstance.

In *Benson*, 323 N.C. at 328, 372 S.E.2d at 522, *Stokes*, 319 N.C. at 27, 352 S.E.2d at 667-68, and *Jackson*, 309 N.C. at 43, 305 S.E.2d at 716, the defendants were convicted of felony murder only. Here, defendant was convicted of murder with premeditation and deliberation. This Court has held "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *judgment vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

Additionally in the case *sub judice*, the jury found the course of conduct aggravating circumstance, N.C.G.S. § 15A-2000(e)(11), in connection with each murder. This Court has held that the (e)(11) circumstance, standing alone, can support a sentence of death. *See State v. Bacon*, 337 N.C. 66, 110, 446 S.E.2d 542, 566 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995).

Further, defendant murdered his wife and stepson in their home. "A murder in the home 'shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure.' " *State v. Adams*, 347 N.C. 48, 77, 490 S.E.2d 220, 236 (1997), *cert. denied*, 522 U.S. 1096, 139 L. Ed. 2d 878 (1998) (alterations in original) (quoting *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987)). Finally, we note that "[n]one of the cases found disproportionate by this Court involved the murder of a child." *State v. Elliott*, 344 N.C. at 288, 475 S.E.2d at 224.

We also compare the present case with cases in which this Court has found the death penalty proportionate. *See McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. We consider all the cases in the pool of similar cases when engaging in proportionality review; however, "we will not undertake to discuss or cite all of those cases each time we carry out that duty." *Id.* For the reasons discussed in the preceding paragraphs, we find the instant case more similar to cases in which we have found a sentence of death proportionate than to those in which we have found a sentence of death disproportionate.

We conclude that defendant received a fair trial and sentencing hearing free from prejudicial error. Accordingly, the death sentences imposed by the trial court must be left undisturbed.

NO ERROR.